**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**ALAN PILNICK,**

                **Plaintiff,**

**-vs-**                                      **Case No. 6:05-CV-1266-ORL-19KRS**

**JO ANNE B. BARNHART,**
**COMMISSIONER OF SOCIAL SECURITY,**

                **Defendant.**

_____

**REPORT AND RECOMMENDATION**

**TO THE UNITED STATES DISTRICT COURT**

      This cause came on for consideration without oral argument on the Complaint filed by Alan Pilnick, seeking review of the final decision of the Commissioner of Social Security denying his claim for social security benefits. Doc. No. 1. The Commissioner answered the Complaint and filed a certified copy of the record before the Social Security Administration (SSA). Doc. Nos. 11-12. This matter has been referred to me for issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b) and Middle District of Florida Local Rule 6.01(c)(21).

**I.     PROCEDURAL HISTORY.**

      In November 2001, Pilnick applied for disability benefits under the Federal Old Age, Survivors and Disability Insurance Programs (OASDI), 42 U.S.C. § 401 *et seq*. (sometimes referred to herein as the Act). R. 65. Pilnick's application was denied initially

and on reconsideration.  R. 48-49.

Pilnick requested a hearing before an administrative law judge (ALJ).  R. 58.  An ALJ held a hearing on July 14, 2004.  Pilnick, represented by an attorney, testified at the hearing.  R. 24-34.  A vocational expert (VE) also testified at the hearing.  R. 34-37.

After considering the testimony and the medical evidence presented, the ALJ determined that Pilnick was insured under OASDI through the date of the decision, which was August 17, 2004.  R. 16. The ALJ found that Pilnick had not engaged in substantial gainful activity since February 1, 2001, the alleged onset date of his disability.  R. 22.

The ALJ concluded that the medical evidence showed that Pilnick had cervical spondylosis[1] following cervical spine decompression surgery with instrumentation, which was a severe impairment.  R. 22.  This impairment did not meet or equal any of the impairments listed in the applicable social security regulations (the Listings).[2]  R. 20.

The ALJ found that Pilnick's mental conditions, specifically depressive disorder, generalized anxiety disorder, conversion disorder, and a personality disorder, were not severe impairments.  In reaching this decision, the ALJ discounted the opinions of Drs. Leli and Carter and gave greater weight to the opinions of Drs. Rosenberg and Weiner

---

[1]   Arthritis of the neck.  Am. Acad. of Orthopaedic Surgeons, *Cervical Spondylosis* (July 2001), http://orthoinfo.aaos.org/fact/thr_report.cfm?Thread_ID=304&topcategory=Neck.

[2]   The Code of Federal Regulations "contains a Listing of Impairments specifying almost every sort of medical problem ('impairment') from which a person can suffer, sorted into general categories."  *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1278 (11th Cir. 2004); 20 C.F.R. Part 404, Subpt. P, App. 1.

because Drs. Rosenberg and Weiner's opinions were rendered later in time and were based on greater evidence, while Dr. Leli's opinion was only provisional. R. 19.

The ALJ concluded that Pilnick had the residual functional capacity (RFC) to perform light work,[3] specifically to "lift/carry 20 pounds occasionally and 10 pounds frequently; push/pull in accordance with lift/carry limitations; stand/walk 6 hours in an 8-hour workday; and sit 6 hours in an 8-hour workday." R. 20. In reaching this conclusion, the ALJ accorded great weight to the opinion of Dr. Sawin. R. 21. The ALJ found no functional limitation due to Pilnick's limited left eye acuity, as Pilnick worked for two months in June 2002, and reported no problems with his vision in his past relevant work. The ALJ also found that Pilnick's reported difficulty with concentration did not result in any functional limitation, noting that Pilnick did not report concentration problems when he worked in June 2002. R. 21.

In reaching this conclusion, the ALJ gave little weight to Pilnick's testimony. R. 21. The ALJ noted that cervical spondylosis accounted for Pilnick's complaints of back, neck and shoulder pain, but that there was no objective evidence to support other limitations. Moreover, the ALJ noted that Pilnick's complaints of severe pain were undercut by his January 2003, statement to a physician that he was no longer interested in treatment. R. 21.

---

[3] Light work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567.

The VE testified that Pilnick's past relevant work as the vice-president of a company was sedentary, skilled work, and that his work as a company director of sales was light, skilled work. R. 21-22. The VE opined that an individual of Pilnick's age, education, work experience, and RFC could return to his past relevant work as it is generally performed in the national economy. R. 22. The ALJ credited the VE's testimony and concluded that Pilnick could perform his past relevant work. Accordingly, the ALJ found that Pilnick was not disabled. R. 22.

Pilnick requested review of the ALJ's decision. R. 12. On June 24, 2005, the Appeals Council issued a decision finding no basis to review the ALJ's decision. R. 7-9. Pilnick timely sought review of this decision by this Court. Doc. No. 1.

Meanwhile, Pilnick filed another application for disability benefits under OASDI. This application was granted, and the SSA concluded that Pilnick was disabled as of June 29, 2006. Doc. No. 22.

## II.   JURISDICTION.

The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Pilnick's request for review. *See Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir. 1998); 20 C.F.R. § 404.981. Therefore, the Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

**III.     STATEMENT OF FACTS.**

   A.     *Pilnick's Testimony and Written Statements.*

Pilnick was born December 8, 1946.  He is six feet tall and weighed 175 pounds at the time of the hearing before the ALJ.  R. 27.

Pilnick graduated from high school and attended about four years of college but did not receive a degree.  R. 27-28.  He worked for fifteen to twenty years in tourism sales and marketing, R. 28-30, 76, 95-102, but stopped working when he became ill in 2001.  He tried to return to work running a small cruise company in 2002, but he found that he had to take a break every fifteen to twenty minutes to lie down.  Accordingly, he left this job after eight weeks.  R. 28, 31-32.

Pilnick complained of pain in his neck due to cervical spondylosis.  He could sit or stand for twenty to twenty-five minutes at a time, then he had to take pain medication and lie down for another fifteen to twenty minutes.  R. 31.  He used a neck brace to have meals and watch television.  R. 32.

Pilnick testified that morphine, which he used to deal with the pain, put him in "la la land."  R. 31.  He wrote that Compazine, taken for dizziness, made him sleepy, and that Lortab and Robaxin, taken for pain, made him dizzy and lightheaded.  R. 80.

In a typical day, the pain began about one to two hours after Pilnick got up in the morning.  R. 32.  Thereafter, Pilnick spent the day changing positions.  R. 32-33.  He also had difficulty sleeping due to pain.  Lack of sleep made him groggy during the day. R. 33.  Medicine also interfered with his ability to sleep.  R. 33.

Pilnick's family helped him with household chores. R. 34, 88-93. He could not lift a gallon of milk. R. 34.

In written statements, Pilnick reported that he had several attacks of the following every day: "blurred vision, dizziness, fainting, cold sweats, pain, unstead[iness], shakes and tremours, ringing in both ears, tingling in arms and legs, weakness in arms and legs, and confusion." R. 75; *accord* R. 103-05, 126. These attacks started about six weeks after his company closed. R. 75. He also reported that he had glaucoma and chronic obstructive pulmonary disease (COPD). *Id.* As a result of these impairments, Pilnick wrote that he could not drive a car, lost his balance, and sometimes could not walk without help. Additionally, he had memory problems and difficulty concentrating. R. 75, 89.

In a written statement, Pilnick's wife confirmed Pilnick's testimony about his physical and mental limitations. R. 91-94, 112-23. She reported that Pilnick was depressed and spent most of the day watching television. R. 122.

B.   *Medical Records.*

Pilnick has a history of gastroesophageal reflux disease, gastritis, COPD, asthma, and glaucoma. R. 127, 134, 137. In January 2001, Ira Shafran, M.D., examined Pilnick for complaints of chronic nausea, indigestion and epigastric distress. R. 147. Pilnick reported taking Compazine for nausea on and off for the previous four years. R. 144; *see also* R. 212.

Dr. Shafran performed an esophagogastroduodenoscopy, which revealed erosive gastritis. R. 145, 153. He treated Pilnick's condition with medication. R. 143-45.

Dr. Shafran also noted tremors, which Pilnick's wife said Pilnick had had for five years. R. 144-45. Dr. Shafran referred Pilnick to a neurologist. R. 144.

In April 2001, Pilnick had an episode of feeling lightheaded with blurred vision followed by chronic shaking. R. 134. Pilnick associated the symptoms with a high dose of Albuterol, which he took for COPD. R. 136. An MRI and CT scan were normal. R. 137. Physical examination revealed normal strength, reflexes, and sensation to touch. R. 137-38.

On April 25, 2001, Daniel T. Layish, M.D., examined Pilnick for possible sleep apnea. R. 205-08. At that time, Pilnick reported that he fell asleep easily and slept through the night. However, when he woke up, he did not feel refreshed, and he had daytime fatigue. He continued to smoke, noting that he had stopped using Wellbutrin, which was prescribed to help him quit smoking, because it caused some tremulousness. R. 206. Examination revealed a mild obstructive ventilatory defect. Dr. Layish also noted a fine resting tremor, which he did not believe was related to sleep apnea. R. 207.

Sohail H. Ali, M.D., examined Pilnick in May 2001. At that time, Pilnick complained of diarrhea, flushing, lightheadedness, ringing in the ears, tremors, and nausea. R. 156. The tests that Dr. Ali ran returned normal results. R. 154.

Arnaldo Isa, M.D., a neurologist, examined Pilnick in May 2001. Pilnick reported episodes of blurred vision, shaking hands, feeling pale, sweating, and ringing in his ears. He felt unsteady but did not experience vertigo or nausea. The episodes were followed by a headache and some neck stiffness. R. 198. Upon physical examination, Dr. Isa noted that Pilnick's strength, reflexes, gait, and sensation to touch were normal. Dr. Isa

observed mild tremors with Pilnick's arms outstretched. Dr. Isa was unable to diagnose the reason for Pilnick's symptoms. R. 196.

James S. Atkins, Jr., M.D., a neurotologist, examined Pilnick in July 2001, for complaints of nausea, blurred vision, significant weakness, and loss of balance. R. 163-65. Testing revealed a unilateral labyrinthine hypofunction.[4] Dr. Atkins adjusted the dosage of Phenergan that Pilnick was taking. R. 162.

Paul D. Sawin, M.D., began treating Pilnick on July 21, 2001. R. 334-35. Pilnick continued to complain of spells involving nausea, blurred vision, tinnitus, and diaphoresis (perspiration), followed by a stiff neck. He had neck pain and upper and lower extremity weakness and numbness. He also had tremors in his hands and loss of manual dexterity. R. 335. Upon examination, Dr. Sawin observed the Pilnick's motor strength and reflexes were normal. Pilnick's memory, cognition, and affect were also normal. An MRI revealed herniated discs in Pilnick's cervical spine with diffuse cervical spondylosis, which caused significant spinal cord impingement and deformation. R. 201-02, 335. Dr. Sawin related Pilnick's problems of upper and lower extremity weakness and decreased manual dexterity to his spinal cord impingement. R. 334. Later that month, Sawin performed a surgical laminectomy on Pilnick. R. 181.

Melvin Greer, M.D., a neurologist, examined Pilnick in August 2001. Pilnick complained of episodes of shaking in his upper and lower extremities, and sometimes his whole body. He also had blurred vision, buzzing in his head, flushing of his face,

---

[4]   Reduced or inadequate functioning of the internal or inner ear. *Stedman's Medical Dictionary* 835, 927 (26th ed. 1995) .

-8-

increased tremulousness, dryness in his mouth, cold sweats, a feeling of nausea, and difficulty walking. The episodes were then occurring two or three times a day. An EEG was normal, and an earlier brain MRI was also normal. R. 190. Upon examination, Dr. Greer observed a mild rhythmic tremor in Pilnick's arms that was exacerbated when he tried to hold an object in his hand. R. 191. Dr. Greer referred Pilnick for a psychiatric examination, indicating that he could not identify any neurological problems. R. 191-92.

Dano Leli, Ph.D., a clinical neuropsychologist, began treating Pilnick in October 2001, and had seven sessions with him through April 12, 2002. R. 342. The record does not contain reports of all of these sessions. During a session in November 2001, Pilnick told Dr. Leli that he had glaucoma, double vision in his left eye, bilateral tinnitus without balance problems, bilateral hearing loss, erosive gastritis with chronic nausea, COPD, and problems arising from cervical spondylosis and herniated discs. R. 347-48. He reported feeling chronically depressed. R. 349. Dr. Leli's impression was that Pilnick had the following: conversion disorder, with seizures or convulsions, provisional; dysthymic disorder, late onset, moderate; generalized anxiety disorder, mild to moderate, provisional; partner relational problem; personality disorder not otherwise specified, provisional. R. 350. Dr. Leli assessed Pilnick's global assessment of functioning (GAF) to be 58.[5] In a summary letter dated October 23, 2002, Dr. Leli's impressions of

---

[5] The Global Assessment of Functioning ("GAF") scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, unable to care for self, or serious suicidal act). *Diagnostic and Statistical Manual of Mental Disorders - Fourth Edition* 32 (4th ed. 1994)(hereinafter the "*DSM-IV*"). A score between 51 and 60 is defined as moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

Pilnick's mental impairments were unchanged.  R. 342-44.  Dr. Leli opined that, as of April 2002, Pilnick "could not engage in any type of full or part-time gainful employment due to his significant neck pain and his ongoing psychological and emotional difficulties."  R. 343.

Dr. Sawin examined Pilnick in October 2001.  Pilnick reported that dexterity in his hands had improved, but he still had stiffness in his neck and decreased range of motion.  Dr. Sawin prescribed physical therapy.  R. 333.

Pilnick underwent physical therapy from November 2001, through February 2002, to address decreased cervical range of motion, including moving his head and lifting his arms.  R. 224-309. The therapist's reports reflect that Pilnick was able to take an overseas flight in December 2001.  R. 278.  He was also able to drive for at least thirty minutes without increased pain.  R. 276.  He reported muscle spasms, but not tremors. *See, e.g.,* R. 249, 260.  He also had weakness and paresthesias in his left hand.  R. 260.

In January 2002, Pilnick continued to complain of neck and shoulder pain and numbness and weakness in his arms and legs.  R. 391.  Kayvan Ariani, M.D., noted upon examination that Pilnick's range of motion in the cervical spine was limited.  R. 392.  Motor strength and sensation were intact, and reflexes were symmetrical.  Dr. Ariani's assessment was myofascial pain syndrome, which he treated with pain medication and trigger-point injections.  R. 220, 385-93.  Pilnick reported in February 2002, that the injection had helped to relieve his neck pain.  R. 215.  In October 2003 and September 2004, Dr. Ariani wrote that Pilnick's pain was managed well with medication.  Pilnick denied having side effects from medication, although he complained of not getting

enough sleep.  R. 400, 402.

On April 1, 2002, Dr. Sawin again examined Pilnick.  At that time, Pilnick reported improvement in stability when walking and in manual dexterity.  He still complained of episodic blurriness of vision and tinnitus, as well as episodic chest palpations.  He also had pain in his neck and restricted range of motion.  R. 332.  An MRI of the cervical spine taken in April 2002, revealed multilevel cervical spondylosis.  R. 331, 336-38.

Pilnick returned to Dr. Sawin for follow-up in October 2002.  He continued to complain of chronic neck pain and a return of parasthesias in his hands.  He had full motor strength in his upper and lower extremities, and his gait was stable.  He had full sensory function.  The diagnosis remained cervical spondylosis.  R. 330.

Leigh Scott Rosenberg, Psy.D., examined Pilnick on October 28, 2002, at the request of the SSA.  Pilnick complained of pain, difficulty sleeping, forgetfulness, difficulty concentrating and memory loss, among other things.  Through a clinical interview, Dr. Rosenberg concluded that Pilnick's concentration was adequate and his memory intact.  His mood was mildly depressed.  R. 354.  Dr. Rosenberg's assessment was that Pilnick suffered from a depressive disorder not otherwise specified (NOS) and chronic pain syndrome.  He assessed Pilnick's GAF as 63.[6]  He opined that Pilnick would have only mild deficits in attention/concentration to tasks and mild to moderate stamina limitations in physical abilities.  R. 355.

---

[6]   A GAF score of 61-70 reflects some mild symptoms (e.g. depressed mood and mild insomnia) or some difficulty in social, occupational or school functioning (e.g. occasional truancy, or theft within the household), but generally functioning well, with some meaningful interpersonal relationships.  *DSM-IV* at 32.

The SSA apparently referred Pilnick for an opthamological evaluation in January 2003. The handwritten report, which is difficult to read, reflects that Pilnick had glaucoma in each eye. Visual acuity in his right eye was 20/20 at a distance and 20/25 near, with correction, but his left eye was 20/200 at a distance and near, with correction. R. 370.

Dr. Sawin also examined Pilnick in January 2003. Pilnick still had neck pain radiating to the upper extremities, but it was "quite tolerable." His cervical range of motion was good, and he walked normally. Dr. Sawin's diagnosis of cervical spondylosis remained unchanged. He wrote that "Mr. Pilnick is not interested in further active treatment." R. 396.

    C.    *Reviewing Professionals.*

In February 2002, Deborah L. Carter, Ph.D., a psychologist, completed a Psychiatric Review Technique form after review of Pilnick's records. Dr. Carter opined that Pilnick had affective, personality, and anxiety-related disorders that resulted in moderate restriction of activities of daily living, maintaining concentration, persistence and pace, and mild limitations in social functioning, with no episodes of decompensation. R. 310-23. Dr. Carter opined that Pilnick would be moderately limited in his ability to do the following: understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; and, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. R. 324-27.

In December 2002, Eric Wiener, Ph.D., also a psychologist, prepared a Psychiatric Review Technique form based on a review of Pilnick's records. He concluded that Pilnick

had an affective disorder that would cause mild limitations in activities of daily living, social functioning, and maintaining concentration, persistence and pace. R. 356-69.

In February 2003, Gloria B. Hankins, M.D., prepared a physical RFC assessment based on review of Pilnick's records. R. 375-82. Dr. Hankins opined that Pilnick could lift fifty pounds occasionally and twenty-five pounds frequently. He could sit, stand, or walk about six hours in an eight-hour workday. He could only occasionally climb and balance due to cervical fusion surgery with vertigo. R. 377. His visual acuity was limited. R. 378. He should avoid concentrated exposure to hazards due to vertigo. R. 379.

D.   *Vocational Expert*.

The VE testified that Pilnick's work as a vice president was skilled, sedentary work. His work as director of sales was skilled, light work. R. 35.

Counsel for Pilnick asked the VE to consider whether medications that limited the ability to concentrate to one-half to one hour at a time would limit his ability to perform his past work. The VE responded that because Pilnick's past work was skilled, the inability to concentrate on a continued basis would eliminate or greatly reduce his ability to perform that kind of work. Similarly, the VE opined that if Pilnick needed to lie down for fifteen minutes every hour or two hours, the occupational base for his previous work would be eroded. R. 36.

**IV.   STANDARD OF REVIEW.**

To be entitled to disability benefits under OASDI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a

continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). In a case seeking disability benefits under OASDI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to disability benefits. 42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be followed in determining whether a claimant is entitled to benefits. In sum, an ALJ must apply the following criteria, in sequence:

> (1) Is the claimant presently unemployed?
>
> (2) Is the claimant's impairment severe?
>
> (3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?
>
> (4) Is the claimant unable to perform his or her former occupation?
>
> (5) Is the claimant unable to perform any other work within the economy?

20 C.F.R. § 404.1520(a)(4). An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability. A negative answer leads to a finding of "not disabled." *See, e.g., McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1987) (per curiam).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits." *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)). However, "the burden temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform." *Id*. at 1278 n.2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210. "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision. *Dyer*, 395 F.3d at 1210. The court may not reweigh the evidence or substitute its own judgment. *Id*.

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988). Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law. *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1146 (11th Cir. 1991)).

When reviewing a final decision issued by the SSA, the court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

**V.   ANALYSIS.**

Pilnick asserts that the ALJ erred by ignoring some of his symptoms and finding that his testimony regarding his limitations was not credible. In a related argument, he contends that the ALJ erred in assessing the functional limitations arising from pain and the side effects of medication. Finally, he submits that the ALJ erred in failing to give controlling weight to the opinion of Dr. Leli, a treating psychologist, regarding his mental impairment. These are the only issues I will address.[7]

*A.  Nonexertional Limitations*.

Pilnick's contention that the ALJ failed to consider his complaints of blurred vision, shaking hands, dizziness, and weakness in his arms and legs is belied by the ALJ's decision. The ALJ wrote as follows: "The medical record reflects persistent complaints

---

[7]   The parties were advised that issues not specifically raised would be waived. Doc. No. 13 at 2.

from the claimant regarding a host of symptoms, including nausea, dizziness, blurred vision, ringing in his ears, tremors in his extremities, flushing in his face, and a cool, clammy feel to his skin." R. 17. The ALJ also expressly noted Pilnick's complaints of "extremity weakness/numbness." R. 18.

The ALJ evaluated these subjective symptoms, as well as limitations arising from pain and side effects of medication, using the pain standard applicable in this circuit. *See* R. 20. "The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Foote v. Chater*, 67 F.3d 1553, 1560 (citing *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991)). If the ALJ discredits the claimant's subjective testimony, he "must articulate explicit and adequate reasons for doing so." *Id*. at 1561-62.

The ALJ acknowledged that the problem with Pilnick's cervical spine was an underlying medical condition that supported limitations in exertional activities as set forth in the RFC. R. 20-21. The ALJ also acknowledged Pilnick's limitations in visual acuity. R. 21. After a thorough review of the evidence, the ALJ found no underlying medical condition supporting Pilnick's complaints of shaking hands and dizziness. R. 18-19.

The ALJ articulated explicit and adequate reasons for determining the functional limitations arising from Pilnick's complaints of pain and other subjective symptoms. The ALJ correctly observed that Dr. Sawin noted in April 2002, that many of these symptoms had resolved, noting only the continuation of episodic blurriness of vision and tinnitus. R. 18, 332. Indeed, as the ALJ observed, Pilnick reported his pain to be "quite tolerable,"

and he sought no further active treatment as of January 2003. R. 21, 396. I note that Pilnick does not cite to evidence from the reports of his extensive physical therapy sessions that he was limited by shaking hands, dizziness, and the like. The ALJ accurately noted that Pilnick's vision problems had existed for quite some time and had not interfered with his ability to work in the past. R. 21.

Because the ALJ followed the law in this circuit, and substantial evidence supports his conclusions, this assignment of error is unavailing.

  B. *Mental Impairments*.

Pilnick contends that the ALJ erred in failing to give great weight to the opinion of Dr. Leli, Pilnick's treating psychologist. The Eleventh Circuit has held that "the law of this circuit is clear that the testimony of a treating physician must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). Good cause has been found where the treating physician's opinion was not bolstered by the evidence, was inconsistent with findings by other physicians or the treating physician's own records, or were merely conclusory. *Id*. (internal citations omitted). "The ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error." *Id*.

As noted above, Pilnick did not supply the ALJ with all of Dr. Leli's medical records. And, as the ALJ observed, Dr. Leli's diagnosis was provisional, even after seven sessions with Pilnick. Moreover, Pilnick did not allege that he had a mental impairment in his disability application, and he did not testify about mental functional limitations in his hearing before the ALJ. After a clinical interview, Dr. Rosenberg determined that Pilnick

had only mild impairments with respect to attention and concentration. Based on the evidence as a whole, good cause exists to support the ALJ's decision to not give controlling weight to Dr. Leli's opinion.

## VI.     RECOMMENDATION.

For the reasons stated herein, I respectfully recommend that the decision of the Commissioner be **AFFIRMED**. I further recommend that the Court direct the Clerk of Court to enter judgment consistent with its decision on this Report and Recommendation and, thereafter, to close the file.

Failure to file written objections to the proposed findings and recommendations contained in this report within **ten (10) days** from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on January 9, 2007.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties